UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

|  |  |  |
|---|---|---|
| LAWRENCE SALERNO, ET AL., | : | CASE NO. 1:23-cv-01419 |
|  | : |  |
| Plaintiffs, | : | ORDER |
|  | : | [Resolving Doc. 20] |
| v. | : |  |
|  | : |  |
| FAMILY HERITAGE LIFE INSURANCE COMPANY OF AMERICA, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

JAMES S. GWIN, UNITED STATES DISTRICT COURT JUDGE:

Defendant Family Heritage Life Insurance Company of America (Family Heritage) dismissed Plaintiff Lawrence Salerno from an insurance sales director position at Family Heritage. Among other competing claims and counterclaims, Plaintiff Salerno says that Family Heritage wrongly withheld $21 million in vested commissions following his termination.

Defendant Family Heritage responds that Plaintiff Salerno broke an exclusive representation agreement—an agreement by Salerno to forego selling any other insurance underwriters' competing policies. Defendant Family Heritage argues that its contract with Salerno allowed it to withhold the estimated $21 million in vested commissions as either liquidated damages or as an unfulfilled condition subsequent.

Salerno, along with his affiliate insurance sales companies—Plaintiffs Dynasty Financial Group LLC (Dynasty) and Pinnacle Brokerage Firm, LLC (Pinnacle)—sues Family Heritage for breach of contract, unjust enrichment, conversion, and defamation.

Case No. 23-cv-1419
GWIN, J.

Defendant Family Heritage brings counterclaims for breach of contract, indemnification, and promissory estoppel against Plaintiffs, and a theft of trade secrets claim against Plaintiffs and various third parties. Family Heritage says that Plaintiff Salerno secretly ran a competing insurance sales enterprise, which, among other issues, led Family Heritage to fire Salerno. Family Heritage says it properly withheld Salerno's commissions due to Salerno's contractual violations.

Plaintiffs have moved for partial judgment on the pleadings on their breach of contract and conversion claims. Plaintiffs argue that the Marketing Agreement forfeiture provision that prohibited competition during the Marketing Agreements' term is an unenforceable penalty.

Plaintiffs do not argue that the Marketing Agreements are unenforceable and do not argue that Family Heritage cannot proceed to show damages from any Plaintiff Salerno breach. Instead, Plaintiffs say the Marketing Agreements' provision that forfeits all Plaintiffs' commissions (the forfeiture provision) is an unenforceable penalty.

Plaintiffs rely on the Sixth Circuit's affirmation of this Court's decision in *Infinity Capital LLC v. Francis David Corporation*,[1] where the Sixth Circuit found a similar contract's forfeiture provision was an unenforceable penalty.

In opposition, Defendant Family Heritage argues that the Sixth Circuit's *Infinity Capital* opinion is distinguishable from the instant case. Family Heritage argues that the Marketing Agreements' forfeiture provision operates as a condition subsequent and allows Family Heritage to stop paying Plaintiffs' vested commissions.

---

[1] Case Nos. 1:18-cv-2442, 1:18-cv-2423, 2019 WL 2336579 (N.D. Ohio June 3, 2019), *aff'd in part*, 851 F. App'x 579 (6th Cir. 2021).

- 2 -

Case No. 23-cv-1419
GWIN, J.

After considering each side's well-presented arguments, the Court finds the Marketing Agreements' forfeiture provision operates as an unenforceable penalty, rather than a condition subsequent. So, for the following reasons, the Court **GRANTS** Plaintiffs' motion for judgment on the pleadings and finds that the Marketing Agreements' forfeiture provisions are invalid. The Court **DENIES** Plaintiffs' motion for judgment on the pleadings as to Plaintiffs' conversion claim.

## I. BACKGROUND

Likely because insurance policies are purchased through monthly or annual premiums, sales agents who secure the contract frequently receive compensation over the life of the policy. This motion asks the Court to decide if Defendant Family Heritage can stop sales commissions to securing agents when, after the policy has been sold, the agent works with other underwriting insurance companies.

Companies selling insurance policies (insurers) often contract with independent insurance sales agents to sell policies to consumers.[2] As specified by an insurer and agent's contract, the agent can earn a commission from the initial sale of an insurance policy. The insurance company-agent contract may also entitle the agent to continued commissions each time the agent's customers renew a policy, even after an agent stops working with an insurer.[3]

Renewal commissions can involve a lot of money. From a single sale of an insurance policy, a sales agent may be entitled to lifetime commissions without any further contact with the insurance policy customer.

---

[2] *Infinity Capital LLC*, 651 F. App'x at 585.
[3] *Id.* (citations omitted).

Case No. 23-cv-1419
GWIN, J.

Sales agents can also recruit, train, and direct teams of other insurance sales agents. For such sales groups, the leader agent can receive a portion of the commissions generated from any subordinate agents' sales. Put simply, the more insurance products sold by an agent, the greater the possibility for a passive revenue stream. And the more times a policyholder renews a policy, the greater the benefit to both insurer and agent.

Defendant Family Heritage's contract with its sales agents specifies that agents have no "relationship of principal and agent, master and servant, or employer and employee [with] FAMILY HERITAGE."[4] Instead, Family Heritage's sales agents like Salerno act as independent contractors, not Family Heritage employees, agents, or servants.

Despite its sales agents being independent contractors, Family Heritage seeks to enforce exclusivity and non-compete agreements against sales agents like Plaintiff Salerno. Such exclusive agency and non-compete restrictions makes an agent "captive"— captive agents are bound to only sell one insurer's products.[5]

In defending Plaintiffs' claim for their vested commissions, Defendant Family Heritage says Plaintiffs' breach of the Marketing Agreements' exclusivity provision allows Family Heritage to keep the policy renewal commissions. Family Heritage says its Marketing Agreements allow it to stop payments.[6]

### A. The Parties' Relationship and the Marketing Agreement

Defendant Family Heritage is an Ohio-based company that sells life and supplemental insurance products.[7] In 2002, Defendant Family Heritage contracted with Plaintiff Lawrence

---

[4] Doc. 1-1, PageID #: 49.
[5] "Noncaptive" agents, on the other hand, are contractually allowed to solicit insurance for multiple insurers at once.
[6] *Id.*
[7] Doc. 1, PageID #: 6; Doc. 6, PageID #: 110.

- 4 -

Case No. 23-cv-1419
GWIN, J.

Salerno to solicit Family Heritage's insurance products.[8] In his role as a Family Heritage Sales Director and later, an Agency Owner, Salerno managed sales representative teams who sold Family Heritage insurance products.[9] Salerno also managed Plaintiffs Pinnacle and Dynasty. Pinnacle and Dynasty act as Texas sales agencies that also entered agreements to sell Family Heritage's insurance products from 2003 to 2011, and from 2011 through Salerno's termination, respectively.[10]

Three similar Marketing Agreements controlled Family Heritage's relationships with Salerno, Dynasty, and Pinnacle. The motion centers on the Marketing Agreements' provisions.

Under the Marketing Agreements, Family Heritage paid commissions to Sales Directors, such as Salerno, when the Sales Director's subordinate sales representative sold a Family Heritage insurance product. The Marketing Agreements also gave Sales Directors later commissions whenever a Family Heritage insurance policyholder renewed that insurance policy.

The Marketing Agreements provided that all commissions credited to the Plaintiffs became fully vested after two years from a Marketing Agreement's execution.[11] That meant that even if a particular Marketing Agreement ended, the Plaintiff would be owed one hundred percent of any commissions he had earned, including future renewal commissions.[12] Salerno says that through the Dynasty and Pinnacle sales organizations, he

---

[8] Doc. 1, PageID #: 6.
[9] *Id.*
[10] *Id.*
[11] Doc. 6-1, PageID #: 154.
[12] *Id.*

- 5 -

Case No. 23-cv-1419
GWIN, J.

has recruited thousands of sales representatives who have sold over $200 million of Family Heritage's insurance products.[13]

Typically, Family Heritage sales representatives were "captive" agents, meaning that they only sold Family Heritage insurance products.[14] Importantly, the Marketing Agreements had two exclusivity provisions that gave Family Heritage the right to stop Plaintiffs' commissions if Plaintiffs sold insurance products other than Family Heritage's. One forfeiture provision applied while the Agreements were active:

> "All commissions that would be paid to the SALES DIRECTOR under this Marketing Agreement shall be forfeited if directly or indirectly the SALES DIRECTOR does any of the following:
>
> (a) While a SALES DIRECTOR under this Agreement, he or she solicits insurance for another insurance company, unless FAMILY HERITAGE has given written authorization to do so."[15]

The forfeiture provision applied to this exclusivity provision is what Plaintiffs say is an unenforceable penalty.

Another provision prohibited Plaintiffs from marketing competitors' insurance for the year following the Agreement's termination, and also allowed for the same forfeiture provision to apply.

The Marketing Agreements also forbade Plaintiffs from soliciting the services of current or former Family Heritage employees, pursuing Family Heritage insurance customers, or committing fraud against Family Heritage. Any of these actions meant that Plaintiffs' commissions would be forfeited.[16] If commissions were forfeited, the Marketing

---

[13] Doc. 1, PageID #: 67.
[14] *Id.*, PageID #: 10.
[15] Doc. 6-1, PageID #: 155-56.
[16] *Id.*

- 6 -

Case No. 23-cv-1419
GWIN, J.

Agreements allowed Family Heritage to claw back commissions paid since the forfeiture event.[17]

The Marketing Agreements were terminable at any time by Family Heritage for "material cause," or by either party for any reason with thirty days prior written notice.[18] Finally, in the event of a "breach or a threatened breach" of the Plaintiffs' obligations, Family Heritage had rights to seek injunctive relief and other remedies.[19]

### B. Salerno's Termination and This Case[20]

Salerno says that despite the exclusivity provisions, Family Heritage knowingly consented to him hiring "non-captive" salespeople, i.e., salespeople selling insurance for other companies simultaneously. Salerno says that, in some cases, Family Heritage consented to non-captive agents because it was profitable for Family Heritage.[21] Salerno says that he met with Family Heritage leadership to discuss recruiting non-captive agents, and that Family Heritage leadership agreed.[22] Since 2019, Dynasty has recruited over 1,200 non-captive agents.[23]

In January 2023, Salerno communicated to Family Heritage leadership his intent to retire from selling Family Heritage insurance products within the next two years.[24] Salerno says that because of his communicating his intention to retire, Family Heritage began to retaliate against him.

---

[17] *Id.* at PageID #: 156.
[18] *Id.* at PageID #: 159.
[19] *Id.* at PageID #: 158-59.
[20] Plaintiffs' motion for partial judgment on the pleadings focuses only on the Marketing Agreements' forfeiture provision. So, the Court does not discuss Plaintiffs' allegations and claims concerning indemnification, advancement account debts, the retirement program, or independent contractor classification at this time. *See* Doc. 1, PageID #: 33, 37.
[21] Doc. 1, PageID #: 13-15.
[22] *Id.* at PageID #: 11.
[23] *Id.*
[24] *Id.* at PageID #: 22-23.

Case No. 23-cv-1419
GWIN, J.

On May 25, 2023, Family Heritage sent Salerno a letter accusing him of violating the Marketing Agreement forfeiture provisions that forbade Salerno from soliciting insurance for another insurance company or recruiting Family Heritage employees to do the same.[25] The May 25, 2023, letter alleged that Salerno had been surreptitiously involved in running a competing insurance sales organization, Empower, since at least 2019.[26] As such, Family Heritage said that they had the right to keep all commissions, including future renewal commissions, owed to Plaintiffs and recover any commissions that Family Heritage paid since the forfeiture event.[27] Family Heritage also noted that it "ha[s] other rights under our agreements as well."[28]

On June 30, 2023, Family Heritage terminated Plaintiffs' Marketing Agreements through a written letter.[29] That letter claimed that Plaintiffs were "in breach of their respective agreements with Family Heritage in multiple ways, including without limitation by directly or indirectly selling insurance of other carriers without the permission of Family Heritage."[30] Family Heritage said it "exercise[d] its right under the parties' agreements to forfeit all future commissions that would be paid under the parties' agreements."[31]

Family Heritage also demanded immediate repayment of debt that Family Heritage had extended to Plaintiffs to finance Plaintiffs' business.[32] Finally, in the termination letter, Family Heritage "reserve[d] all of its rights to assert its other contractual and legal rights and

---

[25] Doc. 1-4, PageID #: 92.
[26] *Id.*, PageID #: 92-93. These allegations are the predicate for Defendant Family Heritage's counterclaims against Plaintiffs. *See* Doc. 6, PageID #: 137-41.
[27] Doc. 1-4, PageID #: 95.
[28] *Id.*
[29] Doc. 6-5, PageID #: 205-206.
[30] *Id.* at 205.
[31] *Id.*
[32] *Id.* at 205-206.

- 8 -

Case No. 23-cv-1419
GWIN, J.

remedies, including without limitation to seek return of commissions paid" since the event causing forfeiture.[33]

As a result, Salerno says that Family Heritage seeks to keep at least $21 million of fully vested commissions lawfully owed to him.[34]

Plaintiffs sued Family Heritage on July 24, 2023. Plaintiffs argue that Family Heritage cannot refuse to pay the vested commissions. Plaintiffs say the Marketing Agreements' provision allowing forfeiture of all renewal commissions is an unlawful and unenforceable penalty.[35] Impliedly, Plaintiffs say Family Heritage must prove what, if any, damages resulted from any Plaintiff failure to comply with the Marketing Agreements' exclusivity provisions. Plaintiffs bring claims for declaratory judgment, breach of contract, unjust enrichment, conversion, and defamation.[36]

Defendant Family Heritage countersued, bringing claims against Plaintiffs for breach of contract, indemnification, promissory estoppel, and trade secrets violation.[37]

On February 8, 2024, Plaintiffs filed the instant motion for partial judgment on the pleadings for their breach of contract and conversion claims.[38] That motion is fully briefed.[39]

## II. LEGAL STANDARD

On a motion for judgment on the pleadings under Rule 12(c), courts use the Rule 12(b)(6) motion standard.[40] In order to survive a defendant's Rule 12(b)(6) motion, "a

---

[33] *Id.*
[34] Doc. 1, PageID #: 23.
[35] *Id.*, PageID #: 27.
[36] *Id.*, PageID #: 33-41.
[37] Doc. 6, PageID #: 137-41.
[38] *See* Doc. 36. On April 19, 2024, Defendant Family Heritage moved to modify the case schedule and for leave to amend its responsive pleadings. *See* Docs. 25, 26. Those motions have no bearing on the Court's analysis for Plaintiff's partial motion for judgement on the forfeiture provision. *See* Doc. 35 (resolving Family Heritage's motions to amend their responsive pleading and to modify the case schedule). On May 22, 2024, Defendants filed their first amended counterclaim and third-party complaint. *See* Doc. 36.
[39] *See* Doc. 22, 23.
[40] *See Tucker v. Middleburg–Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008).

- 9 -

Case No. 23-cv-1419
GWIN, J.

complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[41] The plausibility requirement is not a "probability requirement," but requires "more than a sheer possibility that the defendant has acted unlawfully."[42]

Thus, "[f]or purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment."[43] Where a plaintiff rather than a defendant moves for judgment on the pleadings, the Court asks "whether the plaintiff's petition, stripped of those allegations which are denied by the defendant's answer, would leave the petition stating a cause of action against the defendant."[44]

With its motion for partial judgment on the pleadings, Plaintiffs generally ask the Court to make a legal ruling that the Marketing Agreements' forfeiture provisions are penalties. The Plaintiffs' motion leaves damages and other issues for later decision.

### III.   DISCUSSION

Because this case is here under the Court's diversity jurisdiction, and because the parties' Marketing Agreements say Ohio law governs the contracts' interpretation, the Court applies Ohio law.[45]

---

[41] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).
[42] *Id.*
[43] *Tucker*, 539 F.3d at 549.
[44] *United Food & Com. Workers, Local 1995 v Kroger Co.*, 51 F.4th 197, 202 (6th Cir. 2022) (quotation omitted).
[45] *Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 715 (6th Cir. 2015) (choice of law provisions generally enforceable under Ohio law). *See Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001) (federal court sitting in diversity applies law of the forum state). *See also* Doc. 6-1, PageID #:161.

Case No. 23-cv-1419
GWIN, J.

### A. Breach of Contract

The parties' arguments center on the same question addressed by the *Infinity Capital* decisions: "What kind of contractual provision is this forfeiture clause: a penalty provision or a condition subsequent?"[46]

"Contract damages seek to compensate actual harm, not punish breaches or deter them through the looming guillotine of draconian damages."[47] For example, a liquidated damages provision "provides for a party that breaches a contract to pay damages in an amount agreed upon by the parties."[48] "Conversely, if the provision does not provide reasonable compensation for actual damages," the liquidated damages provision will be held to be an unenforceable penalty.[49]

Plaintiffs argue that the forfeiture provision is just that—an unenforceable penalty.[50] In opposition, Defendant Family Heritage argues that the forfeiture provision is an enforceable condition subsequent.[51]

The Court agrees with Plaintiffs. The Marketing Agreement's provision that forfeits all going-forward commissions should Plaintiff market any other insurance company products while involved with Family Heritage is an unenforceable penalty. Family Heritage cannot withhold Plaintiffs' commissions on that basis. While Family Heritage may show that Plaintiffs broke Marketing Agreements' exclusivity provisions and non-solicitation provisions, Family Heritage will need to prove the amount of resulting damages.

---

[46] 851 F. App'x at 583.
[47] *Infinity Capital LLC*, 2019 WL 2336579 at *7 (citing *In re Graham Square, Inc.*, 126 F.3d 823, 828 (6th Cir. 1997) (applying Ohio law); *Embleton v. McMechen*, 143 N.E. 177, 179 (Ohio 1924)).
[48] *Carl Raston Ins. Agency, Inc. v. Nationwide Mut. Ins. Co.*, No. 23336, 2007 WL 397313, at *3 (Ohio Ct. App. Feb. 7, 2007) (citation omitted).
[49] *Id.* (quotation omitted).
[50] Doc. 20, PageID #: 328.
[51] Doc. 22, PageID #: 459.

- 11 -

Case No. 23-cv-1419
GWIN, J.

The Court leaves open, however, the possibility that Family Heritage may have a valid post-termination right to restrict Plaintiffs' commissions on other grounds.

In *Infinity Capital*, this Court examined a termination clause like the forfeiture provision here. The *Infinity Capital* defendant relied on the termination clause to withhold $5 million of the plaintiff's residual commissions.[52] The Court found the termination clause was a penalty: "an aggressive consequence for breach entirely divorced from actual harm designed to scare a party into compliance."[53] The termination clause did not allow the breaching plaintiff opportunity to cure, nor was there any indication that the clause was any good faith estimate of potential damages.[54]

The Sixth Circuit agreed with the Court's reasoning. The Sixth Circuit noted that unlike a valid liquidated damages clause, the *Infinity Capital* termination clause allowed the defendant to seek a monetary amount significantly greater than, and unrelated to, its actual losses from the plaintiff's breach.[55]

The forfeiture clause's plain language in this case functions like the *Infinity Capital* penalty.

"The element common to most liquidated damages clauses that get struck down as penalty clauses is that they specify the same damages regardless of the severity of the breach."[56] Here, regardless of the nature or scope of Plaintiffs' breach, the forfeiture clause gives Family Heritage the same damages amount: "[a]ll commissions that would be paid . . . under the Marketing Agreement[s]."[57]

---

[52] *Infinity Capital*, 2019 WL 2336579 at *7.
[53] *Id.* at *8.
[54] *Id.* at *7, *9.
[55] *Infinity Capital, LLC*, 851 F. Appx' at 584.
[56] *Id.* at 584 (citing *XCO Int'l Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1004 (7th Cir. 2004)).
[57] Doc. 6-1, PageID #: 155.

Case No. 23-cv-1419
GWIN, J.

These aggressive damages do not attempt to estimate Family Heritage's expected actual loss from a hypothetical breach of Plaintiffs selling competing insurance while the Marketing Agreements were in effect. Recall, Plaintiffs have sold large volumes of insurance policies that benefitted, and with renewals, continue to benefit Family Heritage. If Salerno or his agents sell new policies for competing underwriting companies, the new policies with other underwriters have little or no impact upon renewals on earlier-sold Family Heritage policies.

If Plaintiffs' agents sold other companies' policies during any captive agency period, the resulting damages seem easy to calculate. If the Marketing Agreements required Salerno to sell only Family Heritage policies; and if Plaintiffs broke that contract provision, the presumptive damage would be the value to Family Heritage of the lost policies.

The forfeiture provision makes no effort to estimate what damages Family Heritage would suffer from Plaintiffs working with a competing company simultaneously with Family Heritage. Rather, the forfeiture provision gives Family Heritage *all* of Plaintiffs' commissions, regardless of whether Defendant was harmed by Plaintiffs selling one competing insurance policy or establishing a fully-fledged competing insurance business.[58] "It is hard to see how a clause seeks to estimate the amount of loss from a breach if it grants the same . . . payment for major and minor breaches alike."[59]

The Marketing Agreements also gave Family Heritage other breach remedies, besides the right to forfeit Plaintiffs' commissions. The Marketing Agreements said that Family

---

[58] *See Infinity Capital, LLC*, 851 F. App'x at 584. *See also In re Graham Square, Inc.*, 126 F.3d at 828 ("[T]he characteristic feature of a penalty is a lack of proportional relation to the damages which may actually flow from failure to perform under the contract.").

[59] *Infinity Capital, LLC*, 851 F. App'x at 584 (citing *Samson Sales, Inc. v. Honeywell, Inc.*, 465 N.E.2d 392, 394 (Ohio 1984)).

- 13 -

Case No. 23-cv-1419
GWIN, J.

Heritage could seek injunctive relief even for a "threatened breach" and that it was not prohibited from "pursuing any other remedy available."[60]

Family Heritage's behavior reflects the forfeiture provision's text's punitive nature. Prior to the litigation, Family Heritage repeatedly told Plaintiffs it has "other rights under [the parties'] agreements as well" as commission forfeiture.[61] Family Heritage warned Plaintiffs that "they have continuing post-termination obligations in their agreements that Family Heritage expects to be honored," and that it "reserves all its rights to assert its other contractual and legal rights and remedies."[62]

In *Infinity Capital,* the Sixth Circuit found that similar language indicated that the forfeiture clause was an unenforceable penalty.[63] There, the defendant treated the forfeiture of residual income as separate from its losses, rather than a measure of those losses. So too here.

Family Heritage counters that the forfeiture clause is not a penalty, but rather the failure of a condition subsequent.[64] Under this reading, the forfeiture clause relieves Family Heritage of its contractual duty to pay Plaintiffs' commissions if a certain condition arises, such as Plaintiffs soliciting competitors' insurance.[65]

---

[60] Doc. 6-2, PageID #: 180.
[61] Doc. 1-4, PageID #: 95. Family Heritage argues that the May 5 and June 30, 2023, letters are extra-contractual evidence that the Court may not consider in resolving these motions. Under Ohio law, however, "[d]ocuments created after a contract's execution . . . are not subject to the parole-evidence rule." *United States v. Ohio*, 787 F.3d 350, 354 (6th Cir. 2015) (citing *Am. Gen . Fin. v. Beemer*, 598 N.E.2d 144, 146 (Ohio Ct. App. 1991)). The letters were drafted well after the Marketing Agreements' 2002, 2012, and 2014 executions. The Court may properly consider them as documents attached to and incorporated by reference in the pleadings in resolving Plaintiffs' motion for partial judgment on the pleadings. *See Rondigo, L.L.C. v. Township of Richmond*, 641 F.3d 673, 680-81 (6th Cir. 2011). Even if the Court were to disregard the letters, the forfeiture provision's text indicates that it is a penalty.
[62] Doc. 6-5, PageID #: 206.
[63] 851 F. App'x at 584.
[64] Doc. 22, PageID #: 459.
[65] *Infinity Capital, LLC*, 851 F. App'x at 585 (citing Restatement (Second) of Contracts § 230(1) & cmt. a.).

Case No. 23-cv-1419
GWIN, J.

In *Infinity Capital*, the Sixth Circuit distinguished the termination clause from an enforceable condition subsequent. Valid condition subsequent provisions give an option to the parties subject to a non-solicitation provision: compete and retain whatever earnings are earned with the competing company, or don't compete, and retain the renewal commissions.[66] In *Infinity Capital*, however, the defendant's litigation behavior showed that it never intended to give plaintiff the *choice* to compete by forfeiting residuals.[67]

Family Heritage argues that unlike the *Infinity Capital* defendant, it has treated the forfeiture clause as a condition on Plaintiffs' residual income, rather than a remedy for breach. Merely changing the label from "penalty" to "condition subsequent," however, does not make it so. Like in *Infinity Capital*, the Court looks at Family Heritage's actions regarding the forfeiture clause throughout the dispute, not just its words.

Family Heritage has treated the forfeiture clause as a penalty to enforce against Plaintiffs since before this litigation began. Looking first at the May 5, 2023, letter to Plaintiff Salerno, Family Heritage stated that "it has been clear that all commissions may be forfeited if 'directly or indirectly' you or your company, . . . solicits insurance for another insurance company."[68]

Tellingly, Family Heritage described this as a "prohibition" on Salerno's behavior, rather than a choice presented by a condition subsequent.[69] In the June 30, 2023 termination letter to Salerno, Family Heritage stated that Plaintiffs breached the Marketing Agreements "in multiple ways, including without limitation by directly or indirectly selling insurance of

---

[66] *Id.* at 585.
[67] *Id.* at 586.
[68] Doc. 1-4, PageID #: 92.
[69] *Id.*

- 15 -

Case No. 23-cv-1419
GWIN, J.

other carriers without the written permission of Family Heritage."[70] And, in Family Heritage's original answer to the complaint and first set of counterclaims, it says that it declared Plaintiffs in breach of the Marketing Agreements for selling competitors' insurance without written permission.[71]

Family Heritage points to the fact that it has not counterclaimed for breach of contract on the exclusivity provision as proof it does not consider the forfeiture clause a penalty.[72] No matter. Even though Family Heritage has chosen not to bring a breach of contract claim for Plaintiffs' pre-termination competition, taking their litigating posture as a whole, Family Heritage treated Plaintiffs to be in breach for that behavior and owing all future commissions as a result.

So, the forfeiture provision damage measure is a penalty, and Family Heritage cannot enforce the liquidated damage provision that forfeits all residual commissions.

Despite this finding that the liquidated damage provision is not enforceable, Defendant Family Heritage retains the right to try to establish Salerno's breach of the exclusivity requirements and to establish the resulting damages.

### B. Conversion

Plaintiffs also move for judgment on their conversion claim. They argue that if the forfeiture provision is an unenforceable penalty, Defendant Family Heritage improperly converted their property by forfeiting Plaintiffs' commissions.[73]

"Under Ohio law, the elements of a conversion claim are: 1) plaintiff's ownership or right to possession of the property at the time of the conversion; 2) defendant's conversion

---

[70] Doc. 6-5, PageID #: 205.
[71] Doc. 6, PageID #: 136-37.
[72] Doc. 22, PageID #: 463.
[73] Doc. 20, PageID #: 343.

- 16 -

Case No. 23-cv-1419
GWIN, J.

by a wrongful act or disposition of plaintiff's property rights; and 3) damages."[74] "A plaintiff may state a claim for conversion based on the unlawful retention of plaintiff's property if (1) the plaintiff demanded the return of the property from the defendant after the defendant exerted dominion or control over the property, and (2) the defendant refused to return the property to the plaintiff."[75]

The Court declines to grant judgment on the pleadings to Plaintiffs on their conversion claim. The Court finds that Family Heritage cannot rely upon the Marketing Agreements' measures of damages—the loss of all commissions—but Family Heritage can nevertheless seek to establish what damages resulted from any Plaintiffs' breach of the Marketing Agreements. So, at this point in the litigation, this judgment grant does not necessarily establish that Plaintiffs had a right to possess their commissions.[76]

Additionally, "[a] plaintiff can state a claim for conversion involving money only where the funds are earmarked or otherwise specifically capable of identification."[77] "In other words, conversion only occurs where there is an obligation to deliver specific money rather than merely to deliver a certain sum."[78]

Whether Plaintiffs' commissions here are funds "specifically capable of identification" presents a mixed question of fact and law not suitable for disposition at this time. Courts applying Ohio law have differed on whether profits given to a party via a contract are property interests subject to conversion.[79]

---

[74] *Metro. Title Agency, Inc. v. Fed. Express. Corp.*, Case No. 3:22-cv-94, 2024 WL 519798, at *6 (S.D. Ohio Feb. 9, 2024) (citing *NPF IV, Inc. v. Transitional Health Servs.*, 922 F. Supp. 77, 81 (S.D. Ohio 1996)) (quotations omitted).
[75] *Wellington Corp. LLC v. Gennari Consulting, Inc.*, 631 F. Supp. 3d 464, 484 (N.D. Ohio 2022) (citations omitted).
[76] *See, e.g.*, Doc. 35, PageID #: 688 (granting leave for Defendant Family Heritage to file a proposed amended counterclaim asserting breach of contract for post-termination solicitation).
[77] *Wellington*, 631 F. Supp. 3d at 484 (citing *Wiggins v. Bank of Am., N. Am.*, 488 F. Supp. 3d 611, 639 (S.D. Ohio 2020)).
[78] *Id.*
[79] *Compare Wellington Corp. LLC*, 631 F. Supp. 3d at 484 (profit distribution agreement did not establish readily identifiable funds that could sustain a conversion claim for specific money); *Landskroner v. Landskroner*, 797 N.E.2d 1002, 1012 (Ohio

Case No. 23-cv-1419
GWIN, J.

Finally, "[t]he existence of a contract action excludes the opportunity to present the same case as a tort action."[80] However, a plaintiff may pursue such a tort claim if it is "based exclusively upon [a] discrete, preexisting duty in tort and not upon any terms of a contract or rights accompanying privity."[81] So, a conversion claim "can proceed where the facts of the case show an intentional tort committed independently, but in connection with a breach of contract."[82]

Plaintiffs do not allege a separate, extra-contractual duty that Family Heritage has violated, save for Plaintiffs' property interest "as identified in the Market Agreements."[83] So, the Court will not grant judgment on Plaintiffs' conversion claim at this time.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** judgment to Plaintiffs on their breach of contract claim on the forfeiture provision. The Marketing Agreements' forfeiture provision is an unenforceable penalty and Defendants may not recover from it.

The Court **DENIES** judgment to Plaintiffs on their conversion claim.

This opinion leaves open the matters of:

- Plaintiffs' claim for declaratory judgement;
- Plaintiffs' claim for breach of contract, but with damages to be established by means other than the Marketing Agreements' forfeiture provision;
- Plaintiffs' claim for unjust enrichment;

---

Ct. App. 2003) (contractually specified profits were not identifiable, personal property, so dismissal at pleadings was proper) with *Silverman v. American Income Life Ins. Co. of Indianapolis*, 2001 WL 1607635 at *12 (Ohio Ct. App. Dec. 18, 2001) (summary judgment appropriate where right to receive monthly renewal commissions "arguably" was a property interest).
[80] *Wellington Corp. LLC*, 631 F. Supp. 3d at 484 (citing *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 437 F. App'x 381, 385 (6th Cir. 2011)).
[81] *Pham Constr. & Co., LLC v. Tran*, 2024-Ohio-634, 2024 WL 692846, at *9 (Ohio Ct. App. Feb. 20, 2024) (quotation and citation omitted).
[82] *Id.* (quotation and citation omitted).
[83] Doc. 1, PageID #: 39.

- 18 -

Case No. 23-cv-1419
GWIN, J.

- Plaintiffs' claim for defamation;

- Plaintiffs' claim for indemnification; and

- All of Defendants' counterclaims and their third-party trade secrets claim.

These claims will be resolved as the case proceeds.

IT IS SO ORDERED.

Dated: May 28, 2024                      *s/    James S. Gwin*
                                                   JAMES S. GWIN
                                                   UNITED STATES DISTRICT JUDGE